Strafford
No. 96-446

THE STATE OF NEW HAMPSHIRE

v.

DAVID COBB

June 24, 1999

640

*Philip T. McLaughlin*, attorney general (*Cynthia L. White*, senior assistant attorney general, on the brief and orally), for the State.

*Law Offices of Cathy J. Green*, of Manchester (*Cathy J. Green and Philip H. Utter* on the brief, and *Ms. Green* orally), for the defendant.

THAYER, J. The defendant, David Cobb, appeals his conviction for one charge of attempted felonious sexual assault, RSA 632-A:3, III (1996) and RSA 629:1 (1996), fifty-three charges of exhibiting or displaying child pornography, RSA 649-A:3, I(c) (1996 & Supp. 1998), and 267 charges of possessing child pornography, RSA 649-A:3, III(a) (1996), alleging numerous errors by the Trial Court (*J. Nadeau*, C.J.). Specifically, the following issues are presented for our review: (1) whether the photographs which form the basis for the defendant's pornography convictions are child pornography as defined by statute; (2) whether the State failed to prove the age of the child in each photograph; (3) whether the pornography indictments are multiplicitous; (4) whether the court's denial of discovery relating to a victim's identification of photographs violated the defendant's rights to present favorable proofs, to exculpatory evidence, and to confront his accusers; (5) whether the out-of-court identification of the defendant by a victim should have been suppressed as a fruit of an illegal arrest; (6) whether the search warrant for the defendant's knapsack was issued without probable cause for the crime of attempted kidnapping; (7) whether the warrantless search of the defendant's automobile was an unreasonable search and seizure; (8) whether the introduction of uncharged

misconduct evidence at trial was error; (9) whether consolidation of the child pornography charges with the attempted felonious sexual assault charge deprived the defendant of his rights to fair trial, to testify in his own defense, and to due process of law; (10) whether the evidence was sufficient to sustain his conviction for attempted felonious sexual assault; (11) whether the defense should have been provided access to the general instructions to the grand jury; and (12) whether the court's consideration of unproven misconduct evidence at sentencing was error. We affirm.

On August 17, 1995, the defendant met thirteen-year-old Bobby K. at the Rochester pool. The defendant was carrying a black knapsack with a brown paper bag inside it. The bag contained a stack of photographs. The defendant showed Bobby many of the photos in the stack. The photos depicted both naked adults and naked children.

On August 21, 1995, the defendant approached twelve-year-old Jeffrey W. in downtown Farmington and asked if he knew anyone who would want to earn $20 by helping to change two retarded children out of their wet bathing suits. The defendant was wearing a t-shirt that read "Camp KYO For Retarded Children" and a camp hat, and he was carrying a black knapsack. When Jeffrey said he was willing to do it, the defendant told him the retarded children were inside a cabin located next to Fernald Park. The defendant began walking with the boy toward the park.

Farmington Police had received a report the previous day that a man had approached two children at a Farmington store, identified himself as a counselor from Camp KYO, and offered the children money to assist him in changing some retarded children that had been swimming at a nearby lake. Because the defendant matched the description of that man, including wearing the same t-shirt and hat, three Farmington Police Officers stopped him while he was walking through town with Jeffrey. The defendant identified himself as a counselor from Camp KYO For Retarded Children, which he claimed was located on Route 153 in Middleton or South Wolfeboro. He admitted that he had solicited Jeffrey to help him in changing some retarded children who had been swimming nearby. He claimed that the underwear he was carrying in his knapsack, which he showed to police, belonged to the children, who were waiting in a parked van. When police checked the area he described, they found no such van and no retarded children.

The defendant told police he could show them "Camp KYO." He took them on an hour-long ride in the police cruiser, through four different towns, to search for the camp which he later admitted did

not exist. The defendant then said he used the "Camp KYO" t-shirt and the underwear in his knapsack as props to gain credibility with the children he approached. He believed that the t-shirt and the offer of money would overcome the children's reluctance to talk to strangers.

When he approached Jeffrey, the defendant was carrying a number of items in his knapsack including children's and adult's underwear, a bikini swimsuit, a sweatshirt bearing the name "Camp KYO For Retarded Children," a Polaroid Instamatic camera, a package of Polaroid film, a bottle of skin care lotion, a pumpkin mask, and a piece of paper entitled "Pay Scale For Helping Pumpkin." The "Pay Scale" listed various sexual acts and prices that would be paid for the performance of them, including $20 for "[a]llowing Pumpkin to Lotion you" with "underwear off." A former student of the defendant's, who was familiar with his handwriting, recognized the handwriting on the "Pay Scale" as the defendant's. The defendant also had in his knapsack 515 photographs, a number of which depicted children and adults engaged in various sexual activities. The defendant said he had an interest in child pornography since the 1970's and created his own after the federal government banned it.

## I. Child Pornography

The defendant's first argument on appeal is that the photographs which form the basis for the child pornography convictions do not violate New Hampshire law. The defendant contends that the photographs are not child pornography because: (1) they are collages that contain components made by juxtaposing adult nude bodies with cut-outs from children's catalogs; (2) no actual children were used or exploited in their creation; and (3) the photographs are not "visual representations" as defined by RSA 649-A:2, IV (1996). The defendant also argues that the State failed to prove that the children who were the subjects of the photographs were actually engaged in either the touching of sexual organs in the context of a sexual relationship, or the actual lewd exhibition of the genitals.

The items at issue are Polaroid photographs. The photographs generally fall into the following categories: adult nude bodies juxtaposed with fully clothed children; composite images containing the sexually immature bodies or body parts of children either depicted by themselves, with or without a face, or juxtaposed with the faces of adults or other children, some altered by the addition of hand-drawn pubic hair; and nude bodies that have been altered by the addition of children's heads.

Pursuant to RSA 649-A:3, I(c) (1996) (amended 1998), a person is guilty of a felony if he or she "[p]ublishes, exhibits or otherwise makes available any visual representation of a child engaging in sexual activity." "Visual representation" is defined as "any pose, play, dance or other performance exhibited before an audience or reproduced in or designed to be reproduced in any book, magazine, pamphlet, motion picture film, photograph or picture." RSA 649-A:2, IV. "Sexual activity" means

> human masturbation, the touching of the actor's or other person's sexual organs in the context of a sexual relationship, sexual intercourse actual or simulated, normal or perverted, whether alone or between members of the same or opposite sex or between humans and animals, any lewd exhibition of the genitals, flagellation or torture.

RSA 649-A:2, III (1969).

The current child pornography statute was amended in 1983, following the United States Supreme Court's decision in *New York v. Ferber*, 458 U.S. 747 (1982). Prior to 1983, New Hampshire's statute was limited to materials that could be proven obscene. In *Ferber*, the issue before the Supreme Court was whether "the New York State Legislature [could], consistent with the First Amendment, prohibit the dissemination of material which shows children engaged in sexual conduct, regardless of whether such material is obscene." *Ferber*, 458 U.S. at 753. The Court explained that because of the state's "compelling interest in prosecuting those who promote the sexual exploitation of children," *id.* at 761, a law regulating child pornography need not adhere mechanically to the three-part test for obscenity originally enunciated in *Miller v. California*, 413 U.S. 15, 24 (1973). The Court concluded that "the States are entitled to greater leeway in the regulation of pornographic depictions of children." *Id.* at 756. As the purpose section to the New Hampshire statute acknowledges, the statute was amended "[i]n accordance with the United States Supreme Court's decision in New York v. Ferber," to make "the dissemination of visual representations of children under the age of 16 engaged in sexual activity illegal irrespective of whether the visual representations are legally obscene." RSA 649-A:1, II (1996).

When construing the meaning of a statute, we first examine the language found in the statute "and where possible, we ascribe the plain and ordinary meanings to words used." *Great Lakes Aircraft Co. v. City of Claremont*, 135 N.H. 270, 277, 608 A.2d 840, 845 (1992)

(quotation omitted). "[C]ourts can neither ignore the plain language of the legislation nor add words which the lawmakers did not see fit to include." *Brown v. Brown*, 133 N.H. 442, 445, 577 A.2d 1227, 1229 (1990). "[T]he legislative intent is to be found not in what the legislature might have said, but rather in the meaning of what it did say." *Corson v. Brown Prods., Inc.*, 119 N.H. 20, 23, 397 A.2d 640, 642 (1979).

We note that because the defendant has only raised an issue of statutory interpretation, we limit our analysis accordingly. RSA 649-A:1, I (1996), which contains the legislature's declaration of findings and purposes, states:

> The legislature finds that there has been a proliferation of exploitation of children through their use as subjects in sexual performances. The care of children is a sacred trust and should not be abused by those who seek to profit through a commercial network based upon the exploitation of children. The public policy of the state demands the protection of children from exploitation through sexual performances.

The defendant argues that because "the legislature made a finding in enacting the child pornography statute that its purpose was to protect children from being used as subjects in sexual performances" that "[t]he legislation does not reach these photographs because no children were used in sexual performances in order to create them."

The statute prohibits the display and possession of "any visual representation of a child engaging in sexual activity." "Visual representation" is defined as a "pose . . . reproduced in any . . . photograph." There is no statutory requirement that the visual representation involve the use of an actual child. *Cf.* Alaska Statutes 11.41.455 (1998) ("with the intent of producing a live performance"); Kansas Statutes Annotated 21-3516 (1995) (amended 1998) ("a real child under 16 years of age"). Furthermore, we see little meaningful distinction between sexually explicit material produced through the use of an actual child and such material that gives the appearance of having been produced through the use of an actual child. As this case illustrates all too graphically, materials which appear to use actual children can be used just as effectively to facilitate the abuse of children.

■ Finally, we disagree that the photographs are not prohibited by the statute because they are not of children "engaging in sexual

activity." The statute defines "sexual activity" to include "human masturbation, the touching of the actor's or other person's sexual organs in the context of a sexual relationship . . . [or] any lewd exhibitions of the genitals." RSA 649-A:2, III. A review of all the photographs at issue supports the conclusion that each depicts a child engaged in sexual activity as defined above.

## II. Age

The second issue raised by the defendant on appeal is that the State failed to prove the age of the child in each photograph. The defendant argues that the descriptions in certain indictments, which referred to specific names and ages of the persons in the photographs as represented in handwritten captions on the margins of the photographs, were elements of the charged crimes that had to be proven beyond a reasonable doubt. For example, exhibit number 007 is a photograph which contains a handwritten caption describing the person portrayed therein as "Mary, 9 helper," "Pumpkin, 13," and "Jennifer 10 helper." The indictment charging the defendant with possession of child pornography based on this photograph states that the defendant

> not being a person exempt from prosecution under the provisions of RSA 649-A:4, did knowingly possess or have under his control a visual representation of a child engaging in sexual activity, involving the lewd exhibitions of the genitals; in that, David Cobb, possessed a photograph [now numbered 007 for identification purposes] which depicts children posed as follows: Mary (9) is looking at and reaching for the erect penis of a male wearing a pumpkin mask, while a smiling Jennifer (10) watches . . . .

The defendant argues that the allegations of specific ages are the equivalent of bills of particulars. The trial court concluded "that the descriptions of the photographs which are there for purposes of identification do not become an element of the offense, that the element of the offense is that the children are below the age of sixteen." We agree. The names and ages referenced in the indictments were surplusage. They were included in descriptions of the poses in the photographs which were set off from the allegations of the material facts and elements of the crime. The trial court appropriately gave the following limiting instruction to the jury:

> On these photographs there's some writing, names, ages, description of activities. You cannot consider that handwrit-

ing to be evidence. It is — you cannot consider it as evidence on the age of the person in the photograph. You cannot consider it as evidence on the activity that is going on in the photograph. That is up to you to determine from all of the evidence, but not from the fact that there is written on these photographs any description of age, any description of sex, or any description of activity. . . . But you cannot use what's written as any evidence of the age of the person, the sex of the person or the activity being conducted in the photograph. That is for you to decide based on the photographs and any other evidence that's admitted on that issue.

■ The State was required to prove that the photographs depicted persons under the age of sixteen. *See* RSA 649-A:2, I (1996). As the trial court recognized, whether the State met its burden was a question for the jury. The determination of the age of the subjects in each photograph is for the trier of fact, relying on "everyday observations and common experiences." *People v. Thomann*, 554 N.E.2d 748, 755 (Ill. App. Ct. 1990). "[I]n determining child pornography, based upon its everyday experiences, a trier of fact can determine from a photograph whether a child is under 'the age of sixteen.'" *People v. Schubert*, 483 N.E.2d 600, 605 (Ill. App. Ct. 1985). "To require identification of the child and conventional proof of age ... . would render statutes designed to protect children inoperable." *Id.* (citations omitted).

### III. Multiple Indictments

The third issue raised by the defendant on appeal is whether the trial court should have quashed all the child pornography indictments because they subjected him to multiple prosecutions and multiple punishments for the same offense contrary to his rights under Part I, Article 16 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. We first consider the defendant's claims under the State Constitution, *State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), and hold that because the elemental evidence for each charge was different, the multiple prosecutions did not violate Part I, Article 16 of the State Constitution. We hold further that the prosecutions were permissible under the United States Constitution because the plain language of the pornography statute permits separate prosecutions for each item of pornographic material that is exhibited or possessed.

 "Multiple indictments are permissible only if proof of the elements of the crimes as charged will in actuality require a difference in evidence." *State v. Stratton*, 132 N.H. 451, 454, 567 A.2d 986, 988 (1989) (quotation and italics omitted). "This 'difference in evidence' test has been adopted by this court as the benchmark for evaluating double jeopardy claims under the New Hampshire Constitution." *Id.* There is little question that the facts charged in any of the indictments at issue in this case would not, if true, sustain any of the remaining indictments. *Cf. State v. Bailey*, 127 N.H. 811, 813, 508 A.2d 1066, 1068 (1986). Rather, the elemental evidence required for each indictment was different. Each photograph is different; therefore, the determination whether each violated RSA chapter 649-A (1996 & Supp. 1998) must be made independently, and the defendant could be found to have committed several violations rather than one. Prosecution of the separate charges in this case did not violate the Double Jeopardy Clause of the New Hampshire Constitution.

In terms of the United States Constitution's Double Jeopardy Clause, "[d]etermination of the proper unit of prosecution is a function of the legislature's intent." *Bailey*, 127 N.H. at 814, 508 A.2d at 1069; *see Bell v. United States*, 349 U.S. 81 (1955).

> Thus, the touchstone of whether the double jeopardy clause is violated in this context is the legislature's articulated intent; and the so-called rule of lenity, which forbids interpretation of a federal criminal statute so as to increase the statutory penalty where Congress' intent is unclear, is applicable only where statutory ambiguity has been found.

*Bailey*, 127 N.H. at 814, 508 A.2d at 1069 (citation omitted). We give the language of a statute a "commonsensical meaning." *United States v. Universal Corp.*, 344 U.S. 218, 221 (1952).

 We hold that the statutory language at issue in this case shows a legislative intent that the displaying or possessing of each photograph constitutes a separate offense. *See Stratton*, 132 N.H. at 455, 567 A.2d at 989 (where provisions of statute unambiguous and consistently singular, legislature intended prosecution for each individual weapon in possession). RSA 649-A:3(c) prohibits the exhibition of "*any* visual representation." (Emphasis added.) RSA 649-A:3(d) prohibits the possession of "*any* visual representation." (Emphasis added.) RSA 649-A:2, IV provides that a visual representation includes "*any* pose . . . reproduced in . . . *any* . . . photograph." (Emphasis added.) Thus, the legislature in-

tended the unit of prosecution to be each separate book, magazine, pamphlet, motion picture film, photograph, or picture. *See* RSA 649-A:2, IV; *Randall Book Corp. v. State*, 558 A.2d 715, 721-22 (Md. 1989) (use of word "any" indicated legislature's intent to establish small unit of prosecution); *Educational Books, Inc. v. Comm.*, 323 S.E.2d 84, 86 (Va. 1984) (gravamen of offense prohibiting the sale of "any obscene item" is the sale of a single obscene item).

*IV. Denial of Discovery*

The fourth issue raised by the defendant is whether the trial court's denial of discovery relating to Bobby K.'s review of the charged photographs denied the defendant his constitutional rights to present all favorable proofs, to exculpatory evidence, and to confront his accusers under the New Hampshire and United States Constitutions.

The defendant argues that the State failed to provide him with potentially exculpatory evidence concerning the process by which Bobby K. identified the photographs underlying the pornography indictments. After reviewing the photographs, Bobby K. failed to remember certain photographs that he had previously identified as having been shown to him by the defendant. The defendant argues that he was "prevented from learning how the complaining witness was presented with the pictures, how he eliminated certain pictures, how much time he spent with pictures, all information which certainly would have formed the basis for determining how to and whether to cross-examine the complaining witness on the details of his identification."

Our review of the record, however, indicates that to the extent the information sought by the defendant existed, it was provided to him. The defendant was informed of the victim's potentially exculpatory statements that he did not remember or was unsure of certain photographs he had previously identified. The State agreed to provide the defendant with copies of all documentation of witness interviews containing the substance of witness statements. The trial court reviewed the county attorney's handwritten notes and concluded that they did not contain exculpatory evidence or any other materials that should have been released to the defense. The director of the victim assistance program, who created a list of photographs that Bobby K. had identified, wrote a report explaining which photos the victim had been shown and the process she followed in showing him the photos and recording the numbers of those Bobby K. identified. In addition, the defense had

an opportunity to depose the director of the victim assistance program. We find no error.

## V. Out-of-Court Identification

The fifth issue is whether the out-of-court identification of the defendant through the use of his arrest picture in the newspaper should have been suppressed as a fruit of his illegal arrest pursuant to Part I, Article 19 of the New Hampshire Constitution and the Fourth and Fourteenth Amendments to the United States Constitution. We affirm the trial court's ruling that the identification of the defendant was not the fruit of his illegal arrest.

The defendant was arrested on August 23, 1995, pursuant to a warrant issued by a justice of the peace. At the defendant's arraignment on the charges that same day, the presiding justice reviewed the affidavit and found there was probable cause to support the defendant's arrest and detention. A news photograph was taken of the defendant at his arraignment that later appeared in an article in the *Boston Globe*. Bobby K.'s mother read the article and realized that it sounded like what her son had told her about a man who, on August 17, 1995, had shown him pornographic photographs of children. When she showed Bobby K. the newspaper photograph, he recognized the defendant as the man who had shown him the pornographic photographs. On August 24, Bobby K.'s mother called the police and reported that the defendant had had contact with her son as well. Bobby K. was the complaining witness in all of the felony displaying indictments.

On April 10, 1996, the trial court ruled that the defendant's arrest was unlawful because the magistrate who signed the arrest warrant lacked the capacity to determine probable cause and was not neutral and detached. The court ordered that any evidence obtained as a result of the arrest not be admitted at trial. The defendant argues that the viewing of his photograph was the fruit of the illegal arrest. "But for" the illegal arrest, the defendant contends, Bobby K. would not have seen the defendant's photograph in the newspaper, and this identification would not have been made.

Consistent with our holding in *State v. Ball*, 124 N.H. at 231, 471 A.2d at 350, we first consider the defendant's claims under Part I, Article 19 of the New Hampshire Constitution, "us[ing] federal case law only as an aid to our analysis." *State v. Plante*, 134 N.H. 585, 588, 594 A.2d 165, 166 (1991). Because the United States Constitution gives the defendant no more rights, it is unnecessary to conduct a separate federal constitutional analysis. *See id.*

"The 'fruit of the poisonous tree' doctrine requires the exclusion from trial of evidence derivatively obtained through a violation of Part I, Article 19 of the New Hampshire Constitution." *State v. Tinkham*, 143 N.H. 73, 75, 719 A.2d 580, 582 (1998). "If the evidence in question has been obtained only through the exploitation of an antecedent illegality, it must be suppressed." *State v. Cimino*, 126 N.H. 570, 573, 493 A.2d 1197, 1200 (1985). Although we recognize that "but for" the illegal arrest, the defendant's photograph might not have been published in the newspaper, the United States Supreme Court has declared a "but for" rule to be inappropriate. As the Supreme Court stated, "[w]e need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). Rather, under *Wong Sun*, the question to be resolved is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488 (quotation omitted); *see State v. Palamia*, 124 N.H. 333, 338, 470 A.2d 906, 909 (1983).

In this case intervening events with little or no connection to the illegal police action broke the causal link between the illegal arrest and the out-of-court identification of the defendant. The actions of the news photographer who took the defendant's picture at his arraignment and Bobby K.'s mother who later saw the photograph in a newspaper story and showed it to Bobby constituted intervening events. In addition, Bobby K. acted independently of the primary illegality in reporting the defendant's actions of August 17, 1995, to his mother and later identifying the photograph in the newspaper. *See United States v. Brown*, 628 F.2d 1019, 1022 (7th Cir. 1980) (purging of taint where actions of third party create evidence following illegal arrest). We hold as a matter of law that on these facts the out-of-court identification arose by means sufficiently distinguishable to be purged of the primary taint. *Compare Johnson v. Louisiana*, 406 U.S. 356, 365 (1972) (holding that lineup detention was sufficiently distinguishable from alleged illegal arrest to purge the primary taint) *with Brown v. Illinois*, 422 U.S. 590, 604-05 (1975) (holding that incriminating statements were inadmissible because taint of illegal arrest was not purged by *Miranda* warnings).

*VI. Search of Knapsack*

The sixth issue raised by the defendant is whether the affidavit in support of the search warrant for his knapsack established probable cause to search for evidence of the crime of attempted kidnapping. The defendant argues that because the warrant application listed as the ground for the search that the police were seeking evidence of attempted kidnapping, the police were required to present evidence of each element of attempted kidnapping, including evidence that the defendant intended to attempt to confine the minors. The defendant contends that "a search for photographs, underwear, camera and film, even if found, would not provide a nexus between those items and the crime of attempted kidnapping."

Facts presented to the judge in support of the search warrant included the following. On August 21, 1995, a man matching the defendant's description, wearing a t-shirt with the words "Camp KYO For Retarded Children," approached two minors. He falsely claimed that he worked for Camp KYO For Retarded Children and offered the children money to go with him and help change retarded children who had been swimming at Sunrise Lake in Middleton. The following day, police saw the defendant, again wearing the "Camp KYO" t-shirt, walking down the street with a third child. The defendant told police that he worked for Camp KYO and that he had offered that child money to help him change retarded children who had been swimming at Sunrise Lake.

There is no Camp KYO registered in the State of New Hampshire. The defendant told police that the retarded children were in a van with other camp employees in a particular area of Farmington. When police checked the area, they found no retarded children and no van. The defendant claimed the camp was located in Middleton or Wolfeboro, and that he could show it to police. When they took a drive with the defendant through the area he described, he could find no such camp. He later admitted to police that there was no Camp KYO and that he had been fabricating the camp to gain the children's "credibility."

The defendant was carrying a knapsack. When he spoke to police, he opened it and removed various articles of male and female underwear. He later told police that the knapsack contained a Polaroid camera, film, and approximately two hundred photographs taken with the camera. He described the photos as being taken from pornographic magazines, with children's faces transposed onto naked bodies. Police observed that the defendant's car contained a sheath knife and a sheet with some type of red or brown staining.

When asked to explain the sheet, the defendant claimed he did not know it was there.

Based on this information, the trial court issued a warrant authorizing the police "to make an immediate search of black knap sack . . . for . . . underwear, photographs of naked women and children, and polaroid camera and film." The trial court concluded that "what is sought will be found and that the State has probable cause to search and that the search will assist in the prosecution of a crime and is based on reliable information."

> Probable cause exists if the person of ordinary caution would be justified in believing that what is sought will be found in the place to be searched and that what is sought, if not contraband or fruits or implements of a crime, will aid in a particular apprehension or conviction. To obtain a search warrant, the police must show that at the time of the application for the warrant there is a substantial likelihood of finding the items sought; they need not establish with certainty, or even beyond a reasonable doubt, that the search will lead to the desired result.

*State v. Bradberry*, 129 N.H. 68, 73, 522 A.2d 1380, 1383 (1986) (quotations, brackets, and ellipses omitted). "A determination of probable cause . . . must be viewed in the light of factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *State v. Brown*, 138 N.H. 407, 409, 640 A.2d 286, 288 (1994) (quotation omitted).

■ Even assuming, without deciding, that the police were required to present evidence of attempted kidnapping, we hold that the facts contained in the search warrant application supported a finding of probable cause. The evidence in the affidavit established that the defendant had made repeated attempts to lure children to go with him under false pretenses. In addition, when the defendant approached the children, he carried his knapsack that contained, on the defendant's own admission, male and female underwear, a Polaroid camera and film, and pornographic photographs. At the time the police officers stopped the defendant, the child was under the defendant's confinement having agreed to accompany him in exchange for money. This satisfies the general elements that the defendant knowingly attempted to confine another under his control with a purpose to commit an offense against him. *See* RSA 633:1 (1996). The search warrant application established probable cause that a search of the knapsack could provide evidence of the crime to

which the search warrant related. It was not required that the facts and circumstances be sufficient to prove guilt beyond a reasonable doubt, to make out a *prima facie* case, or even to establish that guilt is more probable than not.

The defendant also argues that even if the affidavit in support of the search warrant was sufficient to establish probable cause, the case should be remanded for further proceedings. As the basis for this, the defendant asserts that the trial court failed to resolve an alleged conflict in testimony between two police officers concerning the timing of the search of the knapsack. While the defendant asserts that two witnesses, Police Chief Carr and Detective Brown, each testified to a different time, the trial court found the timing of the search to be in accordance with the warrant. A review of the record reveals sufficient evidence to support the trial court's finding that resolved the timing issue in favor of Detective Brown and disregarded the ambiguous testimony of Police Chief Carr. Because the trial court made a finding of fact that is supported by the record, we find no error.

## VII. Search of Automobile

The seventh issue raised by the defendant is whether the warrantless search of his automobile violated his rights under Part I, Article 19 of the New Hampshire Constitution. Two items were seized by the police from the defendant's car: a stained sheet and a knife. At trial, the court precluded the State from introducing the knife because it was not relevant. The State did not seek to introduce the stained sheet into evidence. Because neither of the items complained of were introduced into evidence at trial, even assuming *arguendo* that the items were seized in a manner contrary to the safeguards of our constitution, the defendant did not suffer any prejudice.

## VIII. Uncharged Misconduct Evidence

The eighth issue raised by the defendant is whether his right to due process and a fair trial as guaranteed by Part I, Article 15 of the New Hampshire Constitution and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution was violated when the trial court permitted the State to introduce uncharged misconduct evidence. Although on appeal the defendant characterizes the challenged evidence as other crimes evidence inadmissible under New Hampshire Rule of Evidence 404(b), a careful review of the record indicates the true nature of the evidence and the basis for the trial court's ruling.

■ The State indicated prior to trial that it intended to introduce through its witness that, on the day before the charged crimes, the police had received a report of a man matching the defendant's description who had approached two children in Farmington. The State was not seeking to introduce this evidence under Rule of Evidence 404(b), and neither the defendant nor the trial court treated it in that manner. The report was not to be offered for its truth, but, rather, as relevant background information to explain the conduct of the police on the day of the charged crimes. The trial court stated in its ruling:

> [T]he potential testimony of a police officer that he . . . had a previous . . . report of an individual who had stopped to talk with children and offered them something to go with him was the reason why on this particular day he was on the lookout for that — any similar activity. . . . It is not offered for the proof of anything. It is not offered under 404-b as a prior bad act for any purpose, and I — unless the defendant does not want me to, at whatever time is requested, I will instruct the jury that that particular testimony is not evidence in the case, is not offered for the proof of whatever was contained, but merely to show the mental state of the police officer at the time he first stopped the defendant.

Furthermore, the trial court gave a limiting instruction to the jury immediately following the police officer's testimony of the report he received from the previous day. That instruction was:

> I want to be clear you understand at this stage that the testimony from this officer about the information that was contained in the report is not evidence having to do with any of the elements of any of the charges in this case. It is not offered as evidence for that purpose. It is merely for the purpose of your consideration of the officer's intent and his mental state and by way of what he did later on that day in contacting the defendant.

We hold that the trial court did not abuse its discretion in allowing this testimony and that any potential prejudice was precluded by the court's limiting instruction.

## IX. Consolidation of Charges

The ninth issue raised by the defendant is whether the consolidation of the child pornography charges with the attempted feloni-

ous sexual assault charge was so prejudicial as to deprive the defendant of his rights to a fair trial, to testify in his own defense, and to due process of law, as guaranteed by Part I, Article 15 of the State Constitution and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Because the defendant fails to raise any arguments in his brief concerning the alleged deprivation of due process, we address only the issues concerning his rights to a fair trial and to testify in his own defense. *Cf. Douglas v. Douglas*, 143 N.H. 419, 429, 728 A.2d 215, 222 (1999). We consider the defendant's claims under the State Constitution, *Ball*, 124 N.H. at 231, 471 A.2d at 350, "us[ing] federal case law only as an aid to our analysis." *Plante*, 134 N.H. at 588, 594 A.2d at 166.

 Decisions regarding joinder of charges for trial rest within the sound discretion of the trial court. *State v. Dellner*, 130 N.H. 89, 90, 534 A.2d 396, 397 (1987). To overturn the trial court's determination on appeal, the defendant must show that "the discretionary ruling is clearly untenable or unreasonable to the prejudice of his case." *State v. Cochran*, 132 N.H. 670, 672, 569 A.2d 756, 757 (1990).

Factors to consider on the appropriateness of the trial court's decision are "whether the evidence in support of each offense was brief, simple and unlikely to confuse a jury, and easily referable to each crime." *State v. Bergmann*, 135 N.H. 97, 101, 599 A.2d 502, 505 (1991) (quotation omitted). The attempted sexual assault charge and the charges for possession of child pornography arose out of the defendant's conduct on the same occasion. The charges of displaying child pornography a week earlier involved many of the same photographs as the possession charges. Therefore, much of the evidence underlying the charges was the same. In addition, in explaining the elements of the crimes, the court told the jury there were three sets of charges: the attempted felonious sexual assault, the possession of pornography charges, and the charges for displaying child pornography. The court explained the elements of each of the three sets of charged crimes and instructed the jurors that they had to determine whether the State had proved each element beyond a reasonable doubt. It also instructed the jury that it had to decide whether the State had proven the elements of the crimes as to each and every photograph. The court provided the jurors with typewritten verdict forms that separated the charges by crime, listed each indictment separately, and provided a place to record the verdict of guilty or not guilty for each indictment. Under these circumstances, we hold that the trial court's ruling was not untenable or unreasonable.

The defendant also argues that he made a convincing showing in his *ex parte* offer of proof that he had important testimony to offer on the pornography charges and a need to refrain from testifying on the attempted sexual assault charge. *State v. Manna*, 130 N.H. 306, 310, 539 A.2d 284, 286-87 (1988). The defendant's attorneys proffered that the defendant would testify on the child pornography charges that the photographs were collages, that none of the photographs were of live, posed children, and that the people in the photographs were not engaged in sexual relationships. The defendant's attorneys also proffered that if the defendant testified on the pornography charges, he would be subject to cross-examination on the facts underlying the attempted sexual assault charge.

 The trial court, however, articulated appropriate reasons for rejecting the defendant's proffered testimony on the pornography charges. "[I]t is my judgment that it does not make any difference how the photograph was created . . . . For that reason, it seems . . . that the grounds . . . in support of severing the cases makes that type of testimony irrelevant." As to the defendant's concern that he would be subject to cross-examination on the sexual assault charge, the court explained that there was no difference "in consolidating the cases for trial, than . . . in any of a number of . . . cases that come before the Court on which there are different crimes tried on different days and which defendants face the prospect of . . . having to respond to many charges in one trial." We hold that "the defendant did not make a convincing showing that he ha[d] both important testimony to give concerning one count and strong need to refrain from testifying on the other[]." *Manna*, 130 N.H. at 310, 539 A.2d at 286-87 (quotation and brackets omitted).

## X. Sufficiency of the Evidence

The tenth issue raised by the defendant is whether the evidence was sufficient to sustain his conviction for attempted felonious sexual assault. The defendant argues that there was insufficient circumstantial evidence to support the conclusion that the defendant intended to sexually assault the victim, Jeffrey W., and that the circumstantial evidence failed to exclude all rational conclusions except guilt of the charged offense. *See State v. Smith*, 127 N.H. 433, 436, 503 A.2d 774, 776 (1985) (circumstantial evidence must exclude all rational conclusions except guilt in order to be sufficient to convict). The defendant argues that based on the evidence introduced by the State, it calls for pure speculation to guess what the defendant's intentions were when he approached Jeffrey W. on August 22, 1995.

The State had to prove beyond a reasonable doubt that the defendant intended on engaging in sexual contact with a person other than his legal spouse who is under the age of thirteen. *See* RSA 632-A:3. The evidence before the jury, viewed in the light most favorable to the State, *see State v. Hodgdon*, 143 N.H. 399, 402, 725 A.2d 660, 663 (1999), is summarized as follows.

On August 22, 1995, the defendant approached Jeffrey W. who was under the age of thirteen and asked him if he knew anyone who wanted to earn $20 to help the defendant change two retarded children out of their bathing suits. The defendant was wearing a t-shirt that purported to be from Camp KYO For Retarded Children and a camp hat, and he was carrying a knapsack. When Jeffrey agreed, the defendant told him the children were inside a cabin located next to Fernald Park, and the two began walking toward the park.

When he approached Jeffrey, the defendant was carrying a number of items in his knapsack including children's and adult's underwear, a bikini swimsuit, a sweatshirt with the name "Camp KYO For Retarded Children," a Polaroid Instamatic camera, a package of Polaroid film, a bottle of skin lotion, a pumpkin mask, and a piece of paper entitled "Pay Scale For Helping Pumpkin." The Pay Scale listed various sexual acts and prices that would be paid for their performance, including $20 for "[a]llowing Pumpkin to Lotion you" with "underwear off." The pay scale purported to be issued "per order of Mrs. Jean R. Johnson Camp Director." The defendant also had in his knapsack 515 photographs, a number of which depicted children and adults engaged in various sexual activities. These photographs and the written captions on them made it clear that it was the genital areas that were to be "lotioned" by the "helpers" and that "lotioning" of a male involved stroking his penis. The defendant later told police those were his "fantasy photos" of his "naked camp."

Three Farmington Police Officers saw the defendant walking with Jeffrey and stopped them. The defendant falsely identified himself to police as a counselor from Camp KYO For Retarded Children, which he claimed was located on Route 153 in Middleton or South Wolfeboro. The defendant said he could not recall the phone number of the camp but offered the names of two persons that he claimed were the owners and a third who he claimed was a counselor. He admitted that he had solicited Jeffrey to help him in changing some retarded children that had been swimming nearby. He claimed that the underwear he was carrying in his knapsack belonged to the children who were waiting in a parked van marked with the Camp

KYO name. No such van and no retarded children were found by the police.

The defendant offered to show the police Camp KYO and took them on an hour-long ride in the police cruiser through four different towns and pretended to search for the camp, which he later admitted did not exist. The defendant said he used the Camp KYO t-shirt and the underwear in his knapsack as "props" to gain credibility with the children he approached. Without "a hook," the defendant said the children would have thought he was a "dirty old man" and would not have anything to do with him. He believed that the t-shirt and the offer of money would overcome the children's reluctance to talk to strangers. When police took the defendant home, he took off the Camp KYO t-shirt and turned it inside out because his wife did not know about the t-shirt.

The defendant offered an exculpatory account of his actions to police that he had an interest in the local children in Farmington because a friend had recently donated a large amount of money to the school system. He said he did not know Jeffrey and had approached him because he wanted to speak to him about his humanistic views on mentally retarded children. The defendant claimed he only intended to talk to Jeffrey about retarded children, pay the boy for his time, and then take him for ice cream. He claimed he had asked Jeffrey to go with him for a walk toward the bridge and said he intended no harm or impropriety.

 We do not agree with the defendant that no rational trier of fact could have found guilt beyond a reasonable doubt. The proper analysis is not whether every possible conclusion has been excluded but, rather, whether other *rational* conclusions based on the evidence have been excluded. *See State v. Laudarowicz*, 142 N.H. 1, 5, 694 A.2d 980, 983 (1997); *State v. Bissonnette*, 138 N.H. 82, 84, 635 A.2d 468, 469 (1993). While the defendant offered an explanation of what his intentions were when he approached Jeffrey W. on August 22, 1995, "a rational trier of fact could have found [his explanation] irrational or not worthy of belief." *State v. Woodman*, 125 N.H. 381, 386, 480 A.2d 169, 172 (1984).

*XI. Grand Jury Instructions*

The eleventh issue raised by the defendant is whether it was error to deny defense counsel's request to be present for or review a transcript of the general instructions to the grand jury that considered the charges against the defendant. At 4:30 in the afternoon on the day before the grand jury was to meet in this case,

the defendant filed a motion requesting that his counsel be present for the instructions to the grand jury, that the instructions be recorded, and that the court instruct the grand jurors that they must diligently inquire into the factual basis for each indictment that the State requests that they return. At a chambers conference the following morning, the trial court denied the motion stating:

> In my view, the grand jury proceedings are the grand jury proceedings, and that encompasses the court's instructions of the grand jury. It is one phase of the grand jury proceedings preliminary to their taking up particular individual cases, but it is, in my view nonetheless, proceedings of the grand jury. And in my experience . . . they have always been closed.

Subsequently, the defendant requested access to the transcription of the grand jury proceedings to determine if the grand jurors had been properly instructed. The request was denied because

> [i]nstruction of jurors is a matter between the Court and the grand jury. It occurs during proceedings which are not open to the public. There are good reasons for the strong public policy of secret grand jury proceedings. This motion does not assert any facts or basis justifying nullification of that policy in this case.

"In conformity with the practice in most States the proceedings of the grand jury in this State are secret." *State v. Booton*, 114 N.H. 750, 755, 329 A.2d 376, 381 (1974). "[W]hether the grand jury's secrecy will be invaded remains a matter within the trial court's discretion in the federal as well as State courts." *Id.; see State v. Silva*, 142 N.H. 269, 272, 699 A.2d 591, 593 (1997) ("for most intents and purposes, all [grand jury] proceedings should be legally sealed against divulgence" (quotation omitted)). Because the court's instructions to the grand jury are part of the secret proceeding, the trial court's refusal to allow defense counsel to be present was not an abuse of discretion.

 In addition, "there is a presumption of regularity which attaches to grand jury proceedings." *State v. Dayutis*, 127 N.H. 101, 104, 498 A.2d 325, 328 (1985). Before entering upon their duties, grand jurors are required to take an oath solemnly swearing that they will "diligently inquire, and a true presentment make, of all such matters and things as shall be given [them] in charge . . . ." RSA 600:3 (Supp. 1998). The defendant has not offered any evidence

of irregularity that occurred during the general instructions to the grand jury nor has he "shown a reason to pierce the secrecy of the grand jury." *State v. Damiano*, 124 N.H. 742, 749, 474 A.2d 1045, 1049 (1984); *see United States v. Warren*, 16 F.3d 247, 253 (8th Cir. 1994) (bare allegation that grand jury records are necessary to determine if there was a defect in the process is not adequate). In the absence of a showing of particularized need, we hold that the defendant was not entitled to the information sought. *See State v. Canatella*, 96 N.H. 202, 205, 72 A.2d 507, 509 (1950); SUP. CT. R. 52(6) (following a showing of a particularized need, defendant may be authorized to examine stenographic record of grand jury proceedings); *United States v. Miramontez*, 995 F.2d 56, 59 (5th Cir. 1993) (burden is on party seeking disclosure to show particularized need for material).

## XII. Unproven Misconduct Evidence

The final issue raised by the defendant is whether the trial court's acceptance and consideration of unproven misconduct evidence at sentencing was error. The evidence related to another offense the defendant allegedly committed in Maine in 1985. At the defendant's June 1996 sentencing hearing, two victims testified about the alleged crime, the defendant's involvement in it, and the effect it had on their lives. In addition, one of the victim's family members addressed the court. At the time of the sentencing hearing, the defendant had been indicted for the offense and was awaiting trial.

"A judge exercises wide discretion in choosing the sources and types of evidence on which to rely in imposing sentence." *State v. Rodrigue*, 127 N.H. 496, 500, 506 A.2d 299, 303 (1985). It is an abuse of discretion to consider offenses for which the defendant has been acquitted or prior convictions which have been found constitutionally infirm. *State v. Cote*, 129 N.H. 358, 375, 530 A.2d 775, 785 (1987). In addition, "sentencing courts should not consider conclusory statements of criminal conduct lacking a factual basis, *i.e.*, evidence that does not carry suspicion to the point of probability." *State v. Tufts*, 136 N.H. 517, 519, 618 A.2d 818, 819 (1992) (quotation and brackets omitted). However, "a trial court may consider evidence of pending charges . . . in determining sentencing." *Cote*, 129 N.H. at 374, 530 A.2d at 784. We have reviewed the testimony offered at the sentencing hearing and hold that it fell well

within the trial court's discretion to consider as it both involved a pending charge and carried suspicion to the point of probability.

*Affirmed.*

All concurred.