Hillsborough-northern judicial district
No. 2006-549

## THE STATE OF NEW HAMPSHIRE

v.

## MARSHALL ZIDEL

Argued: June 20, 2007
Opinion Issued: January 18, 2008

*Kelly A. Ayotte*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Theodore Lothstein*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Marshall Zidel, appeals his conviction on nine counts of possession of child pornography, *see* RSA 649-A:3 (2007), arguing that the Superior Court (*Lewis*, J.) erred in denying his motions to dismiss. We reverse.

The following facts were found by the trial court for purposes of ruling upon the defendant's pretrial motion to dismiss or were stipulated to by the parties. At the time he was arrested, the defendant worked as a photographer at a camp in Amherst for children fifteen years old and younger. In that capacity, the defendant took pictures that were to be used to make an end-of-summer video yearbook or scrapbook for the children attending the camp.

On July 4, 2005, the defendant gave three CD-ROM discs to the camp director. On one of the discs, the director discovered images depicting heads and necks of minor females superimposed upon naked adult female bodies, with the naked bodies engaging in various sexual acts. One image shows an act of sexual intercourse; two images depict a person engaging in or about to engage in cunnilingus; two images depict a person digitally penetrating or touching a female's genitalia; and four images show comparably explicit sexual activity. The defendant and at least one of his family members appear in some of the images. The parties stipulated that, "[o]ther than necks and heads, there is no specific evidence that the images in question contain the body parts of actual children." In addition to these images, the CD-ROMs contained the original non-pornographic camp photographs of the minor females.

The camp director identified two of the faces in the images as those of campers from the summer of 2004, who would have been fifteen years old at the time the photographs were taken. He gave the discs to the Amherst Police Department. The parents of all the females involved were able to identify the individuals as girls under sixteen at the time the images were created. When questioned, the defendant told the police that the sexually explicit "photographs were only his 'personal fantasy' and that they were not real." The defendant was indicted for possession of child pornography.

Before trial, the defendant moved to dismiss, arguing that the prosecution pursuant to RSA 649-A:3, I(e) violated his rights under Part I, Article 22 of the New Hampshire Constitution and the First Amendment to the United States Constitution. Following the denial of his motion, the defendant was convicted based upon stipulated facts.

On appeal, the defendant argues that the trial court erred in denying his constitutional challenges to RSA 649-A:3. That statute provides, in relevant part, that "[a] person is guilty of a felony if such person ... (e) Knowingly buys, procures, possesses, or controls any visual representation of a child engaging in sexual activity." RSA 649-A:3, I (2007). The defendant contends that, under both the Federal and State Constitutions, RSA 649-A:3 is facially overbroad, and as applied to his conduct, violates his right to free speech.

For purposes of this appeal, although we acknowledge that the images at issue may more properly be characterized as "composite images," *see United States v. Rearden*, 349 F.3d 608, 613 (9th Cir. 2003) (noting distinction between "composite" and "morphed" images), we adopt the terminology used by the United States Supreme Court in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 242 (2002), and refer to the images in question as "morphed images." *Ashcroft*, 535 U.S. at 242. As the Supreme Court explained, in contrast to wholly computer-generated images, there

is a "more common and lower tech means of creating virtual images, known as computer morphing. Rather than creating original images, pornographers can alter innocent pictures of real children so that the children appear to be engaged in sexual activity." *Ashcroft*, 535 U.S. at 242.

We first address the defendant's as-applied challenge. We review questions of constitutional law *de novo*. *State v. Decato*, 156 N.H. 570, 573 (2007). As noted above, the defendant raises his claims under both the State and Federal Constitutions. Our settled rule is to first address the defendant's claims under the State Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), and cite federal opinions for guidance only. *State v. MacElman*, 154 N.H. 304, 307 (2006). Here, however, because United States Supreme Court precedents compel us to hold that criminalizing the defendant's mere possession of the images in question violates his First Amendment rights, and because we are required to follow federal constitutional law, an analysis under the State Constitution is unnecessary. We therefore decide this case under the First and Fourteenth Amendments to the Federal Constitution.

"The First Amendment commands, 'Congress shall make no law ... abridging the freedom of speech.'" *Ashcroft*, 535 U.S. at 244. "As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear." *Id.* at 245. "[A] law imposing criminal penalties on protected speech is a stark example of speech suppression." *Id.* at 244. If a statute regulates speech based upon its content, application of the statute is subject to strict scrutiny. *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000); *see Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). This places the burden upon the State to prove that the statute is "narrowly tailored to promote a compelling [state] interest. If a less restrictive alternative would serve the [state]'s purpose, the legislature must use that alternative." *Playboy Entertainment Group*, 529 U.S. at 813 (citation omitted).

The United States Supreme Court has determined that content-based restrictions on certain categories of speech satisfy strict scrutiny, and, thus, are not entitled to absolute constitutional protection. *Ashcroft*, 535 U.S. at 245-46; *see People v. Alexander*, 791 N.E.2d 506, 509 (Ill. 2003). This unprotected speech "includ[es] defamation, incitement, obscenity, and pornography produced with real children." *Ashcroft*, 535 U.S. at 246. Obscenity and child pornography are the two categories relevant here.

"The regulation of child pornography was initially rooted in the Supreme Court's obscenity doctrine." *United States v. Williams*, 444 F.3d 1286, 1290 (11th Cir. 2006). In *Miller v. California*, 413 U.S. 15 (1973), the Supreme Court reaffirmed that distribution of "obscene material is not protected by the First Amendment," *id.* at 36, and set forth a standard for

determining what materials may be regulated as obscenity, *id.* at 24. Under this standard, "the Government must prove that the work, taken as a whole, appeals to the prurient interest, is patently offensive in light of community standards, and lacks serious literary, artistic, political, or scientific value." *Ashcroft*, 535 U.S. at 246 (citing *Miller*, 413 U.S. at 24).

While the government has "broad power to regulate obscenity," the Supreme Court held in *Stanley v. Georgia*, 394 U.S. 557 (1969), that this "power ... does not extend to mere possession by the individual in the privacy of his own home." *Stanley*, 394 U.S. at 568. In so holding, the Court rejected all of Georgia's justifications for banning the mere possession of obscene materials. *Id.* at 565-68. First, the Court explained that the asserted "right to protect the individual's mind from the effects of obscenity" is "wholly inconsistent with the philosophy of the First Amendment." *Id.* at 565-66. Second, it rejected Georgia's assertion that "exposure to obscene materials may lead to deviant sexual behavior or crimes of sexual violence," because there was "little empirical basis for that assertion" and "the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law." *Id.* at 566-67 (quotation omitted). Third, the Court found that, in a possession case, there is no "danger that obscene material might fall into the hands of children, or that it might intrude upon the sensibilities or privacy of the general public." *Id.* at 567 (citations omitted). Finally, the Court flatly rejected the argument that "prohibition of possession of obscene materials is a necessary incident to statutory schemes prohibiting distribution" as a result of "difficulties of proving an intent to distribute or in producing evidence of actual distribution." *Id.* It found that such difficulties, if they existed, did not "justify infringement of the individual's right to read or observe what he pleases." *Id.* at 568. Accordingly, the Supreme Court held that "the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime." *Id.*

With respect to child pornography, *New York v. Ferber*, 458 U.S. 747, 764-66 (1982), and *Osborne v. Ohio*, 495 U.S. 103, 111 (1990), together hold that a state may proscribe the distribution and mere possession of child pornography. Both cases recognized that states have a compelling interest "in safeguarding the physical and psychological well-being of a minor." *Ferber*, 458 U.S. at 756-57 (quotation omitted); *see Osborne*, 495 U.S. at 109.

In *Ferber*, the Court relied upon three justifications for a proscription on the distribution of child pornography. First, the Court reasoned, "The distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children in at least two ways": (1) "the materials produced are a permanent record of the children's

participation and the harm to the child is exacerbated by their circulation"; and (2) "the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled." *Ferber*, 458 U.S. at 759. Second, the Court determined that "[t]he advertising and selling of child pornography provide an economic motive for and are thus an integral part of the production of such materials, an activity illegal throughout the Nation." *Id.* at 761. Finally, the Court found that "[t]he value of permitting live performances and photographic reproductions of children engaged in lewd sexual conduct is exceedingly modest, if not *de minimus*." *Id.* at 762. It noted that if "visual depictions of children performing sexual acts ... were necessary for literary or artistic value, a person over the statutory age who perhaps looked younger could be utilized. Simulation outside of the prohibition of the statute could provide another alternative." *Id.* at 762-63.

Accordingly, because "[r]ecognizing and classifying child pornography as a category of material outside the protection of the First Amendment [wa]s not incompatible with [its] earlier decisions," *id.* at 763, the Court concluded that, generally, "[c]ontent-based restrictions on child pornography satisfy strict scrutiny," *Alexander*, 791 N.E.2d at 510 (citing *Ferber*, 458 U.S. at 756-59). The Court noted, however, that there are "limits on the category of child pornography which, like obscenity, is unprotected by the First Amendment." *Ferber*, 458 U.S. at 763. Thus, "distribution of descriptions or other depictions of sexual conduct, not otherwise obscene, which do not involve live performance or photographic or other visual reproduction of live performances, retains First Amendment protection." *Id.* at 764-65.

In *Osborne*, the Court extended *Ferber*'s holding to allow states to proscribe the mere possession of child pornography. *Osborne*, 495 U.S. at 111. The Court noted that, in contrast to *Stanley*, where Georgia "was concerned that obscenity would poison the minds of its viewers," *id.* at 109 (citation omitted), Ohio did "not rely on a paternalistic interest in regulating Osborne's mind," *id.* Rather, Ohio proscribed possession of child pornography "to protect the victims of child pornography" by "destroy[ing] a market for the exploitative use of children." *Id.* Thus, the Court found that "the interests underlying child pornography prohibitions far exceed[ed] the interests justifying the Georgia law at issue in *Stanley*." *Id.* at 108.

*Osborne* additionally found that several interests justified Ohio's ban upon the possession of child pornography. First, "the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child." *Id.* at 109. Second, it explained

that "penaliz[ing] those who possess and view" child pornography will decrease its production, "thereby decreasing demand." *Id.* at 109-10. Third, relying upon *Ferber*, the Court reasoned: "[M]aterials produced by child pornographers permanently record the victim's abuse. The pornography's continued existence causes the child victims continuing harm by haunting the children in years to come. The State's ban on possession and viewing encourages the possessors of these materials to destroy them." *Id.* at 111 (citation omitted). Finally, the Court found that "encouraging the destruction of these materials is . . . desirable because evidence suggests that pedophiles use child pornography to seduce other children into sexual activity." *Id.* Accordingly, "[g]iven the gravity of the State's interests in this context," the Court held that Ohio could "constitutionally proscribe the possession and viewing of child pornography." *Id.*

In *Ashcroft*, the Supreme Court declared unconstitutional as overbroad section 2256(8)(B) of the Child Pornography Prevention Act of 1996 (CPPA), *see* 18 U.S.C. §§ 2251 *et seq.*, which prohibited "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, that is, *or appears to be,* of a minor engaging in sexually explicit conduct." *Ashcroft,* 535 U.S. at 241 (quotations omitted; emphasis added). This "section capture[d] a range of depictions, sometimes called 'virtual child pornography,' which include computer-generated images, as well as images produced by more traditional means." *Id.* It also encompassed pornography "created by using adults who look like minors." *Id.* at 239-40.

In finding section 2256(8)(B) overbroad, the Supreme Court, although not explicitly, applied the strict scrutiny standard described above. *See Alexander,* 791 N.E.2d at 511 (concluding that, in *Ashcroft,* "section[] 2256(8)(B) . . . did not pass strict scrutiny because . . . [it was] not narrowly tailored to advance the government's compelling interest in protecting actual children from sexual abuse"); Note, *Ashcroft v. Free Speech Coalition: How can Virtual Child Pornography be Banned Under the First Amendment,* 31 PEPP. L. REV. 825, 855 (2004) ("the Justices implicitly applied strict scrutiny"). The Court noted, "[T]he [Government's] speech ban is not narrowly drawn. The objective is to prohibit illegal conduct, but this restriction goes well beyond that interest by restricting the speech available to law-abiding adults." *Ashcroft,* 535 U.S. at 252-53.

The Government first argued that virtual child pornography fell within the category of child pornography unprotected by *Ferber* because it is "virtually indistinguishable from child pornography." *Id.* at 249. The Court rejected this contention for two reasons. First, in *Ferber,* "[t]he production

of the work, not its content, was the target of the statute." *Id.* Thus, "[w]here the images are themselves the product of child sexual abuse, *Ferber* recognized that the State had an interest in stamping it out without regard to any judgment about its content." *Id.* (citation omitted). The Court clarified that *Osborne* "anchored its holding [that possession of child pornography is unprotected] in the concern for the participants, those whom it called the 'victims of child pornography.' It did not suggest that, absent this concern, other governmental interests would suffice." *Id.* at 250 (citation omitted).

Second, the Court rejected the Government's assertion that virtual child pornography "can lead to actual instances of child abuse." *Id.* It explained that, for virtual child pornography, "the causal link is contingent and indirect" because "[t]he harm does not necessarily follow from the speech, but depends upon some unquantified potential for subsequent criminal acts." *Id.* The Court found such indirect harms insufficient because, although "child pornography rarely can be valuable speech," *id.*, "*Ferber*'s judgment about child pornography was based upon how it was made, not on what it communicated," and "*Ferber* did not hold that child pornography is by definition without value," *id.* at 250-51. The Court concluded, "In contrast to the speech in *Ferber*, speech that itself is the record of sexual abuse, the CPPA prohibits speech that records no crime and creates no victims by its production. Virtual child pornography is not 'intrinsically related' to the sexual abuse of children, as were the materials in *Ferber*." *Id.* at 250. Accordingly, the Court rejected the government's assertion that virtual child pornography is unprotected speech under *Ferber*. *Id.* at 251.

Given its holding that virtual child pornography is protected speech, the Court went on to apply strict scrutiny to determine whether the Government could constitutionally proscribe this speech. Applying this demanding test, the Court flatly rejected the Government's justifications for banning virtual child pornography. First, the Government asserted that "the CPPA [wa]s necessary because pedophiles may use virtual child pornography to seduce children." *Id.* The Court disagreed and found that the CPPA was not "narrowly drawn" to achieve this objective. *Id.* at 252. It explained, "The Government cannot ban speech fit for adults simply because it may fall into the hands of children. The evil in question depends upon the actor's unlawful conduct, conduct defined as criminal quite apart from any link to the speech in question." *Id.* Thus, the restriction upon virtual child pornography went "well beyond" the interest in "prohibit[ing] illegal conduct" by "restricting the speech available to law-abiding adults." *Id.* at 252-53.

Second, the Government submitted that "virtual child pornography whets the appetites of pedophiles and encourages them to engage in illegal conduct." *Id.* at 253. This rationale could not sustain the ban on virtual child pornography because "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Id.* Quoting *Stanley*, 394 U.S. at 566, the Court explained that "[t]he government 'cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts.'" *Id.* It also "may not prohibit speech because it increases the chance an unlawful act will be committed at some indefinite future time." *Id.* (quotation omitted). Accordingly, because "[t]he Government ha[d] shown no more than a remote connection between speech that might encourage thoughts or impulses and any resulting child abuse," *id.*, the Court concluded that "the Government [could] not prohibit speech on the ground that it may encourage pedophiles to engage in illegal conduct," *id.* at 253-54.

Third, the Government "argue[d] that its objective of eliminating the market for pornography produced using real children necessitates a prohibition on virtual images as well." *Id.* at 254. The Government submitted that since they are often indistinguishable and exchanged in the same market, the "virtual images promote the trafficking in works produced through the exploitation of real children." *Id.* Rejecting this market deterrence theory, the Court noted that "[i]n the case of the material covered by *Ferber*, the creation of the speech is itself the crime of child abuse; the prohibition deters the crime by removing the profit motive." *Id.* Because "there is no underlying crime at all" with virtual child pornography, the Government's market deterrence theory did not justify the statute. *Id.*

Finally, the Government maintained that virtual child pornography needed to be banned because advanced technology makes it difficult to determine whether "pictures were made by using real children or by using computer imaging," thus making it difficult "to prosecute those who produce pornography by using real children." *Id.* at 254-55. The Supreme Court found that this argument "turn[ed] the First Amendment upside down." *Id.* at 255. It explained: "Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse." *Id.* Thus, the Government could not ban "unprotected speech if a substantial amount of protected speech [wa]s prohibited or chilled in the process." *Id.* Accordingly, because section 2256(8)(B) left "unprotected a substantial amount of speech not tied to the Government's interest in distinguishing images produced using real children from virtual ones," and "cover[ed] materials beyond the

categories recognized in *Ferber* and *Miller*," the Court held that the provision was "overbroad and unconstitutional." *Id.* at 256.

Relying upon the foregoing cases, the defendant argues that applying RSA 649-A:3 to his private possession of morphed images, namely "images created by combining the head and shoulders of a real, existing child, with images of adult bodies, real or virtual, engaging in sexually explicit conduct," violates his right to free speech under both the Federal and State Constitutions. The defendant "does not claim that the state or federal constitutions preclude the government from criminalizing the *distribution* of such material." Rather, he contends that "*Ashcroft, Ferber* and *Osborne*, read together, mandate the conclusion that morphed images, that depict actual children but depict no children actually engaging in sexually [*sic*] activity, do not constitute child pornography." According to the defendant:

> [T]he overall set of rationales and principles relied upon by *Ferber*, and reinforced by *Ashcroft*'s discussion of *Ferber*, support the narrow view that materials cannot be classified as child pornography unless children are involved in the production process—not the "post-production" process where images can be cut, pasted, and morphed—but the production process, the actual, sordid, filming or photography of child sexual abuse.

The State counters that because the defendant's images "incorporate identifiable pictures of real children," they "create harm to those children, even if the original pictures did not involve sexual activity, [since] those children are *depicted* as participating in such activity through manipulation of their likeness." The State argues that "harm is caused even when only one person views such an image," and, thus, "the State has a legitimate interest in preventing that harm, and no right of free speech is violated by prohibiting the possession of such images."

■ RSA 649-A:1 (2007) declares the legislature's purpose in criminalizing child pornography. It provides, in pertinent part:

> The legislature finds that there has been a proliferation of exploitation of children through their *use as subjects in sexual performances*. The care of children is a sacred trust and should not be abused by those who seek to profit through a commercial network based upon the exploitation of children. The public policy of the statute demands the protection of children from exploitation through sexual performances. . . . In accordance with the United States Supreme Court's decision in New York v. Ferber, this chapter makes the dissemination of visual

representations of children under the age of 16 engaged in sexual activity illegal irrespective of whether the visual representations are legally obscene.

(Emphasis added.) Interpreting the identical legislative declaration in New York's statute, *Ferber* found that a state has a compelling interest "in safeguarding the physical and psychological health of a minor." *Ferber*, 458 U.S. at 756-57 (quotation omitted). As with our legislature's declaration, the focus in New York's statute was to combat the harm resulting to children from the distribution of depictions of sexual conduct involving live performance or visual reproduction of live performances by children. *Id.* at 764-65. Thus, the purpose of RSA 649-A:3 is to prevent harm to children resulting from their "use as subjects in sexual performances." RSA 649-A:1.

 While this interest is undoubtedly compelling, *Ferber*, 458 U.S. at 756-57, criminalizing the *possession* of materials depicting heads and necks of identifiable minor females superimposed upon naked female bodies, where the naked bodies do not depict body parts of actual children engaging in sexual activity, does not promote this interest. Contrary to the State's assertion, when no part of the image is "the product of sexual abuse," *Ashcroft*, 535 U.S. at 249, and a person merely possesses the image, no demonstrable harm results to the child whose face is depicted in the image.

In *Ashcroft*, the Court emphasized that *"Ferber's* judgment about child pornography was based upon how it was made, not on what it communicated." *Ashcroft*, 535 U.S. at 250-51. Unlike the images in *Ferber* and *Osborne*, the images in this case do not "permanently record the [child]'s abuse." *Osborne*, 495 U.S. at 111. Although they may constitute a "permanent record" that *if distributed* may be harmful to the depicted child, such harm does not necessarily follow from the mere possession of these morphed images. Instead, the harm is contingent upon the occurrence of another arguably unlawful act; to wit, distribution. *See Ashcroft*, 535 U.S. at 250. The State "may not prohibit speech because it increases the chance an unlawful act will be committed at some indefinite future time." *Id.* at 253 (quotation omitted).

Further, while *Osborne* proscribes the mere possession of pornography produced with real children, *see Ashcroft*, 535 U.S. at 245-46; *Osborne*, 495 U.S. at 111, its holding is anchored in "the concern for the participants, those whom it called the 'victims of child pornography,'" *Ashcroft*, 535 U.S. at 250 (quoting *Osborne*, 495 U.S. at 110). These participants are the children who have been sexually abused or exploited in the production of the materials. *Ferber*, 458 U.S. at 759. The mere possession of morphed

images depicting no victims of child pornography cannot "haunt[] the children in years to come," *Osborne*, 495 U.S. at 111, since the children do not know of their existence and did not participate in their production. Therefore, the foundation for *Osborne*'s proscription on possession of child pornography is not present here.

Moreover, while a ban upon the possession of these morphed images may encourage possessors to destroy them, besides the indirect harm that may result from the potential distribution of these materials, the State has not advanced any additional narrow justification supporting this interest. As explained above, the possible circulation of these materials is insufficient justification for banning protected speech. *Ashcroft*, 535 U.S. at 250, 253. To the extent the State asserts that these morphed images require destruction because pedophiles use them to "seduce other children into sexual activity," *Osborne*, 495 U.S. at 111, the Supreme Court explicitly rejected this rationale in *Ashcroft*. *Ashcroft*, 535 U.S. at 253-54. Additionally, because they are not the product of the crime of child abuse, criminalizing the possession of these morphed images created from "innocent pictures" of actual children would not eliminate the market for pornography produced through the abuse of real children. *Ashcroft*, 535 U.S. at 254. Therefore, their possession is "not 'intrinsically related' to the sexual abuse of children, as were the materials in *Ferber*." *Ashcroft*, 535 U.S. at 250.

Finally, however distasteful, reprehensible, and valueless this conduct might seem, *cf. Ferber*, 458 U.S. at 762, the First Amendment protects "the individual's right to ... observe what he pleases," *Stanley*, 394 U.S. at 567-68. This protection is central to our long and sacred tradition of prohibiting the government from intruding into the privacy of our thoughts and the contents of our homes. We cannot displace this guarantee simply because the materials at issue may express ideas that are unconventional and not shared by a majority. *See id.* at 566.

Although *Ashcroft* stated, in dicta, that morphed images "implicate the interests of real children and are in that sense closer to the images in *Ferber*," *Ashcroft*, 535 U.S. at 242, *Ferber* involved the *distribution* of child pornography, not its possession, *Ferber*, 458 U.S. at 751-52. Unlike a distribution case, in the private possession realm, neither the real child nor the general public observes the images; only the possessor views them. *See Stanley*, 394 U.S. at 567. Thus, while distribution of these morphed images might implicate the interests of real children, mere possession does not cause harm to the child. Accordingly, applying the standard articulated in *Ashcroft*, *Ferber*, and *Stanley* to the defendant, the statute is not narrowly tailored to achieve the State's asserted objectives.

The State cites *United States v. Bach*, 400 F.3d 622 (8th Cir. 2005), *cert. denied*, 546 U.S. 901 (2005), in support of its position that these morphed images may be criminalized. In *Bach*, "a photograph of the head of a well known juvenile, AC, was skillfully inserted onto the body of [a young] nude *boy* so that the resulting depiction appear[ed] to be a picture of AC engaging in sexually explicit conduct with a knowing grin." *Bach*, 400 F.3d at 632 (emphasis added). The Eighth Circuit Court of Appeals found:

> Although there is no contention that the nude body actually is that of AC or that he was involved in the production of the image, a lasting record has been created of AC, an identifiable minor child, seemingly engaged in sexually explicit activity. He is thus victimized every time the picture is displayed. Unlike . . . virtual child pornography or . . . pornography using youthful looking adults . . . , this image created an identifiable child victim of sexual exploitation.

*Id.* The Court noted, however, that "[t]his is not the typical morphing case in which an *innocent* picture of a child has been altered to appear that the child is engaging in sexually explicit conduct," and that "there may well be instances in which the [statute] violates the First Amendment." *Id.* at 632 (emphasis added).

*Bach* is distinguishable for two reasons. First, in *Bach*, the defendant challenged his conviction "for *receipt* of child pornography under [18 U.S.C.] § 2252A(a)(2)," *id.* at 629 (emphasis added), not *possession* of child pornography, *see* 18 U.S.C. § 2252A(a)(5). A conviction under 18 U.S.C. § 2252A(a)(2) requires that a person "knowingly *receive*[] or *distribute*[] . . . child pornography [or material that contains child pornography] that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer." 18 U.S.C. § 2252A(a)(2) (emphases added); *see Bach*, 400 F.3d at 630. Since these pictures do not remain within the privacy of a person's home, but instead disseminate into commerce, the interests of real children arguably may be implicated in such cases. Here, the defendant was not charged with receiving or distributing the images. *See* RSA 649-A:3, I(c)-(f). Therefore, we do not address whether we might reach the same result as *Bach* if presented with a case involving the receipt or distribution of morphed images.

Second, unlike these morphed images, the *Bach* picture depicted a young nude *boy* engaged in sexually explicit activity. *Bach*, 400 F.3d at 632. Thus, in *Bach*, the creation of the photograph involved the use and sexual exploitation of a real child. In contrast, the record here contains no evidence indicating that any of these morphed images depict similar conduct by a real child. Accordingly, while we might reach a different

result if presented with the facts in *Bach*, this case constitutes one of those instances where application of a statute proscribing the possession of child pornography violates the First Amendment. *Id.*

■ Our finding that application of RSA 649-A:3, I(e) to the defendant's conduct violates his First Amendment right to free speech is limited to the facts of this particular case, where the defendant is charged with mere possession of morphed images that depict heads and necks of identifiable minor females superimposed upon naked female bodies, and the naked bodies do not depict body parts of actual children engaging in sexual activity. Given this finding, we do not reach the defendant's overbreadth challenge. Accordingly, the defendant's convictions are reversed.

*Reversed.*

BRODERICK, C.J., concurred; HICKS, J., dissented.

HICKS, J., dissenting. Because I believe that United States Supreme Court precedents do not compel the result the majority reaches and I believe that the State may constitutionally criminalize the defendant's mere possession of the images in question, I respectfully dissent. I would hold that the images possessed and controlled by the defendant are "visual representation[s] of a child engaging in sexual activity" as proscribed by RSA 649-A:3 (2007); that the statute is not fatally overbroad; and that its applicability to the defendant's conduct violates no free speech rights.

First, I cannot conclude that *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), compels a finding that the defendant's morphed images are protected speech under the First Amendment to the United States Constitution in part because the Court explicitly left that question open. The respondents in *Ashcroft* did not challenge the provision of the Child Pornography Prevention Act of 1996 (CPPA), 18 U.S.C. §§ 2251 *et seq.*, that prohibits morphed images. *Id.* at 242.

Writing for the majority in *Ashcroft*, Justice Kennedy explained:

> Section 2256(8)(C) [of the CPPA] prohibits a more common and lower tech means of creating virtual images, known as computer morphing. Rather than creating original images, pornographers can alter innocent pictures of real children so that the children appear to be engaged in sexual activity. Although morphed images may fall within the definition of virtual child pornography, they implicate the interests of real children and are in that sense closer to the images in [*New York v. Ferber*, 458 U.S. 747 (1982)]. Respondents do not challenge this provision, and we do not consider it.

*Id.* I believe that this is precisely the case left undecided by *Ashcroft.* Moreover, in my view, much of *Ashcroft* and *Ferber* is *dicta,* and, as such, does not compel any particular result in this case.

Although I believe that the majority correctly analyzes the *Ferber* factors, I would simply draw the opposite conclusion. For instance, the *Ferber* Court recognized that States have a compelling interest "in safeguarding the physical and psychological well-being of a minor." *Ferber,* 458 U.S at 756-57 (quotation omitted). I believe that this interest is implicated when pictures of identifiable real children are altered to make it appear as though the children are engaging in sexual activity. The *Ferber* Court noted the legislative and professional opinion that "the use of children as *subjects* of pornographic materials is harmful to the physiological, emotional, and mental health of the child." *Id.* at 758 (emphasis added). I believe that a child need not actually engage in the sexual activity depicted in morphed child pornography to be a victim of sexual exploitation. *See United States v. Bach,* 400 F.3d 622, 632 (8th Cir.), *cert. denied,* 546 U.S. 901 (2005) (concluding that image depicting the head of "AC, an identifiable minor child" on the nude body of an unidentified boy in a sexually explicit pose, "created an identifiable child victim [*i.e.,* AC] of sexual exploitation"). I also believe that the State has a compelling interest in protecting children from such exploitation.

The *Ferber* Court noted that "[t]he distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children in at least two ways:" (1) "the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation;" and (2) "the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled." *Ferber,* 458 U.S. at 759. I acknowledge that the morphed images here do not implicate these concerns as directly as the images at issue in *Ferber*—images that the *Ashcroft* Court described as "speech that itself is the record of sexual abuse," *Ashcroft,* 535 U.S. at 250. Because they can be produced from "innocent pictures of real children," *id.* at 242, morphed images do not require the sexual abuse of a child for their production. Nevertheless, such images do produce a permanent record of the children's apparent participation in sexual activity. *Cf. Ferber,* 458 U.S. at 759. As discussed above, I believe that such images sexually exploit the real child whose image is used and I find the conclusion inescapable that "the harm to the child is exacerbated by their circulation." *Id.* Additionally, if one accepts the premise that morphed pornographic images of real children exploit those children, it logically follows that the production of such morphed images "requires the sexual exploitation of [those]

children," *id.* Thus, I believe that morphed pornographic images of actual children sufficiently implicate the second *Ferber* rationale.

Another factor in the *Ferber* Court's reasoning was that "[t]he value of permitting live performances and photographic reproductions of children engaged in lewd sexual conduct is exceedingly modest, if not *de minimis*." *Id.* at 762. I believe that the value of permitting the exploitation of children by using their images to create virtual depictions of them engaged in sexual activity is *de minimis* at best.

Admittedly, not all of the *Ferber* factors obtain here; in my view, however, the absence of one or more of the *Ferber* factors is not fatal to this prosecution. The presence of those listed above is sufficient to warrant classifying the images possessed by the defendant as child pornography within the meaning of *Ferber*. Having reached that conclusion, I would hold that the images in question fall squarely within *Osborne v. Ohio*, 495 U.S. 103 (1990), in which the Supreme Court held that States may constitutionally criminalize the mere possession and viewing of child pornography, *id.* at 111. In addition, using the above-cited federal opinions for guidance only, *see State v. Ball*, 124 N.H. 226, 233 (1983), in the absence of controlling state precedent, I would hold that criminalizing the defendant's mere possession of the images at issue does not violate the State Constitution. Accordingly, I would reject the defendant's as-applied challenge and reach his facial challenge.

The defendant argues that this court's construction of RSA 649-A:3 in *State v. Cobb*, 143 N.H. 638 (1999), renders that statute substantially overbroad under the reasoning of *Ashcroft*. Although *Ashcroft* declared two provisions of the CPPA unconstitutional, only the first of those provisions, section 2256(8)(B), is relevant to this case. That section prohibited "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, that is, or appears to be, of a minor engaging in sexually explicit conduct." *Ashcroft*, 535 U.S. at 241 (quotations omitted). In concluding that section 2256(8)(B) was unconstitutionally overbroad, the Court declared that "[b]y prohibiting child pornography that does not depict an actual child, the statute goes beyond *New York v. Ferber*." *Id.* at 240.

The defendant contends that in *Cobb*, this court "construed [RSA 649-A:3] to extend to visual representations that did not involve any actual child engaging in sexual activity." The defendant cites the following language:

> There is no statutory requirement that the visual representation
> involve the use of an actual child. Furthermore, we see little
> meaningful distinction between sexually explicit material

> produced through the use of an actual child and such material that gives the appearance of having been produced through the use of an actual child.

*Cobb*, 143 N.H. at 644 (citations omitted).

As the trial court similarly concluded, however, the defendant takes the statement out of context. The defendant in *Cobb* argued that the statute did not apply to his "photographs because no children were used in sexual performances in order to create them." *Id.* This court's response, therefore, was focused upon the "use" of a child in a sexual performance. Thus, in saying that the statute did not require "the use of an actual child," *id.*, the court held that the statute did not require that a child actually engage in the sexual activity depicted. In my view, that statement was not intended to decide whether or not the child depicted must be an actual child, as that question was not before the court.

Because I agree with the State that RSA 649-A:3 can be construed to apply only to images of real children, I would hold that the statute is not unconstitutionally overbroad. RSA 649-A:3, I, provides, in relevant part, that "[a] person is guilty of a felony if such person . . . (e) Knowingly buys, procures, possesses, or controls any visual representation of a child engaging in sexual activity." "Child" is defined to mean "any *person* under the age of 16 years." RSA 649-A:2, I (2007) (emphasis added). I conclude that construing the word "person" in RSA 649-A:2, I, to mean a real person, and the word "child" in RSA 649-A:3 to mean a real child, is a permissible interpretation of the statute. *Cf. Commonwealth v. Simone*, No. 03-0986, 2003 WL 22994238, at *15, *14 (Va. Cir. Ct. Nov. 12, 2003) (concluding that plain language of statute "confines its application to images utilizing actual children" where "[t]he statute specifically requires that the material at issue utilize or have as its subject a 'person'").

When RSA 649-A:2, I, is construed to refer to an actual child, RSA 649-A:3 does not reach the "virtual" pornography at issue in *Ashcroft*: images that look like real children but that are in fact wholly computer-generated. *See Ashcroft*, 535 U.S. at 241. In addition, because "[c]hild" is specifically defined to mean a "person under the age of 16 years," RSA 649-A:2, I, RSA 649-A:3 covers only images of actual persons who are, in fact, under sixteen years of age and does not reach images that appear to be of children but that are, in reality, of young-looking adults. *Cf. State v. Fingal*, 666 N.W.2d 420, 424 (Minn. Ct. App. 2003) ("'Minor' is defined [in the statute] as 'any person under the age of 18.' If the sexual performance depicted does not, in fact, involve a person under the age of 18, possession of the depiction is not prohibited."). Accordingly, under this construction, RSA 649-A:3 would not suffer the infirmities that rendered section

2256(8)(B) of the CPPA substantially, and therefore unconstitutionally, overbroad. Other courts have reached similar conclusions. *See id.* at 425 (concluding that where a statute prohibiting child pornography requires that "[t]he visual depiction must be of an identifiable minor, not a virtual child," the statute complies with *Ashcroft*); *State v. Tooley*, 872 N.E.2d 894, 907 (Ohio 2007) ("[M]orphed child pornography that uses images of real children . . . is not covered by the *Ashcroft* definition of protected virtual child pornography."), *cert. denied*, 128 S. Ct. 912 (2008). I would also hold, using the above-cited federal opinions for guidance only, *see Ball,* 124 N.H. 233 (1983), in the absence of controlling state precedent, that RSA 649-A:3 is not fatally overbroad under the State Constitution.

The defendant's final challenge to his conviction alleges insufficiency of the evidence. That challenge is expressly conditioned, however, upon this court having "resolve[d] the constitutional issues by construing RSA 649-A:3 narrowly so that it does not reach [the defendant's] conduct." As I would not so construe the statute, I would not reach the defendant's final argument. Accordingly, I would uphold the trial court's denial of the defendant's motions and affirm the result below.